**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHAD IDOL,                         )
individually and on behalf of the class   )
defined herein,                 )
                             )
        Plaintiff,         )
                             )     **FILED: MAY 15, 2008**
      vs.                 )     **08CV2819**        **AEE**
                             )     **JUDGE GOTTSCHALL**
UNIFUND CCR PARTNERS;       )     **MAGISTRATE JUDGE COX**
CREDIT CARD RECEIVABLES FUND, INC.,  )
and ZB LIMITED PARTNERSHIP,    )
                             )
        Defendants.       )

**COMPLAINT – CLASS ACTION**

**MATTERS COMMON TO MULTIPLE CLAIMS**

**INTRODUCTION**

      1.      There is a substantial problem with debt buyers suing on debts that they do not own and have no right to sue on.

      2.      There are multiple reported cases in which debtors have been subjected to litigation because they "settled" with A and then B claimed to own the debt. Smith v. Mallick, 514 F.3d 48 (D.C.Cir. 2008) (commercial debt purchased and resold by debt buyer, debt buyer [possibly fraudulently] settles debt it no longer owns, settlement held binding because notice of assignment not given, but obligor subjected to litigation as result). See also, Miller v. Wolpoff & Abramson, LLP, 1:06-CV-207-TS, 2008 U.S. Dist. LEXIS 12283 (N.D.Ind., Feb. 19, 2008), where a debtor complained he had been sued twice on the same debt; Dornhecker v. Ameritech Corp., 99 F. Supp. 2d 918, 923 (N.D.Ill. 2000), where the debtor claimed he settled with one agency and was then dunned by a second for the same debt, and Northwest Diversified, Inc. v. Desai, 353 Ill.App.3d 378, 818 N.E.2d 753 (1st Dist. 2004), where a commercial debtor paid the creditor only to be subjected to a levy by a purported debt buyer.

      3.      In Wood v. M&J Recovery LLC,. CV 05-5564, 2007 U.S. Dist. LEXIS

1

24157 (E.D.N.Y., April 2, 2007), a debtor complained of multiple collection efforts by various debt buyers and collectors on the same debt, and the defendants asserted claims against one another disputing the ownership of the portfolio involved. Shekinah alleged that it sold a portfolio to NLRS, that NLRS was unable to pay, that the sale agreement was modified so that NLRS would only obtain 1/5 of the portfolio, and that the 1/5 did not include the plaintiff's debt. Portfolio claimed that it and not Shekinah is the rightful owner of the portfolio.

4.    In Associates Financial Services Co. v. Bowman, Heintz, Boscia & Vician, P.C., IP 99-1725-C-M/S, 2001 U.S. Dist. LEXIS 7874, *9-12 (S.D.Ind., April 25, 2001), later opinion, 2004 U.S. Dist. LEXIS 6520 (S.D. Ind., Mar. 31, 2004), allegations were made that a creditor had continued to collect accounts allegedly sold to a debt buyer.

5.    Courts have also dismissed  numerous collection and foreclosure lawsuits filed in the names of entities that did not own the purported debts.   In re Foreclosure Cases, 1:07CV2282 and 14 others, 2007 U.S. Dist. LEXIS 84011, 2007 WL 3232430 (N.D. Ohio Oct. 31, 2007); In re Foreclosure Cases, 07-cv-166 and 18 others, 2007 U.S. Dist. LEXIS 90812 (S.D. Ohio Nov. 27, 2007); In re Foreclosure Cases, 521 F. Supp. 2d 650 (S.D.Ohio. 2007); In re Foreclosure Cases, 07-cv-166 and 14 others, 2007 U.S. Dist. LEXIS 95673 (S.D.Ohio, Dec. 27, 2007); NovaStar Mortgage, Inc.  v. Riley, 3:07-CV-397, 2007 U.S. Dist. LEXIS 86216 (S.D.Ohio, Nov. 21, 2007); NovaStar Mortgage, Inc.  v. Grooms, 3:07-CV-395, 2007 U.S. Dist. LEXIS 86214 (S.D.Ohio., Nov. 21, 2007); HSBC Bank USA v. Rayford, 3:07-CV-428, 2007 U.S. Dist. LEXIS 86215 (S.D.Ohio., Nov. 21, 2007); Everhome Mtge. Co. v. Rowland, 2008 Ohio 1282; 2008 Ohio App. LEXIS 1103 (Ohio App. March 20, 2008) (judgment for plaintiff reversed because it failed to introduce assignment or establish that it was the holder of the note and mortgage); Deutsche Bank National Trust Co. v. Castellanos, 277/07, 2008 NY Slip Op 50033U; 18 Misc. 3d 1115A; 2008 N.Y. Misc. LEXIS 44; 239 N.Y.L.J. 16 (Kings Co., N.Y., Sup. Ct., Jan. 14, 2008); HSBC Bank USA, N.A. v. Valentin, 15968/07, 2008 NY Slip Op 50164U; 14 Misc. 3d 1123A; 2008 N.Y. Misc. LEXIS 229 (Kings Co., N.Y., Sup. Ct., January 30, 2008);

2

HSBC Bank USA, N.A., v. Cherry, 21335/07, 2007 NY Slip Op 52378U; 18 Misc. 3d 1102A; 2007 N.Y. Misc. LEXIS 8279; 239 N.Y.L.J. 2 (Kings Co., N.Y. Sup. Ct., Dec. 17, 2007); Deutsche Bank National Trust Co. v. Castellanos, 15 Misc. 3d 1134A; 841 N.Y.S.2d 819 (Kings. Co., N.Y. Sup. Ct. 2007).

6.    Debt buyer American Acceptance has a lawsuit pending alleging that a broker of charged-off debts sold it debts to which it did not have title. American Acceptance Co. v. Goldberg, 2:08cv9 (N.D.Ind.). Another debt buyer, Hudson & Keyse, filed suit alleging that the same debt broker obtained information about consumer debts owned by Hudson & Keyse and used the information to try to collect the debts for its own account, even though it didn't own them. Hudson & Keyse, LLC v. Goldberg & Associates, LLC, 07-81047-civ (S.D.Fla., filed Nov. 5, 2007). A similar suit, alleging that the broker resold accounts it did not own, was filed by Old National Bank, Old National Bank v. Goldberg & Associates, 9:08-cv-80078-DMM (S.D.Fla., Jan. 24, 2008). The same debt broker is accused in another complaint of selling 6,521 accounts totaling about $40 million face value which it did not own. RMB Holdings, LLC v. Goldberg & Associates, LLC, 3:07-cv-00406 (E.D.Tenn., filed Oct. 29, 2007). Other debt buyers have voiced similar complaints. "Florida Broker Faces Multiple Lawsuits," Collections & Credit Risk, April 2008, p. 8.

7.    In a related abuse, debt buyers would "purchase" debts with minimal information about the debtor and then try to "collect" them from anyone with a similar name. In 2004, the Federal Trade Commission shut down a debt buyer called CAMCO headquartered in Illinois. The following is from a press release issued by the FTC in connection with that case.

> . . . In papers filed with the court, the agency charged that as much as 80 percent of the money CAMCO collects comes from consumers who never owed the original debt in the first place. Many consumers pay the money to get CAMCO to stop threatening and harassing them, their families, their friends, and their co-workers.
>
> According to the FTC, CAMCO buys old debt lists that frequently contain no documentation about the original debt and in many cases no Social Security Number for the original debtor. CAMCO makes efforts to find people with the same name in the same geographic area and tries to collect the debt from them – whether or not they are the actual debtor. In papers filed with the court, the FTC

3

alleges that CAMCO agents told consumers – even consumers who never owed the money – that they were legally obligated to pay. They told consumers that if they did not pay, CAMCO could have them arrested and jailed, seize their property, garnish their wages, and ruin their credit. All of those threats were false, according to the FTC. . . . (http://www.ftc.gov/opa/2004/12/camco.htm)

8.     In order to protect Illinois residents against this sort of abuse, the Illinois Collection Agency Act ("ICAA") was amended effective January 1, 2008 to define debt buyers as "collection agencies". This makes applicable the special assignment requirements in ICAA §8b, 225 ILCS 425/8b. Illinois courts had held prior to the amendment that a party that was required to but did not have such an assignment does not have a valid claim and that the defendant in such a case is entitled to judgment. Business Service Bureau, Inc. v. Webster, 298 Ill. App. 3d 257; 698 N.E.2d 702 (4th Dist. 1998).

9.     Section 8b of the ICAA provides:

**Sec. 8b. An account may be assigned to a collection agency for collection with title passing to the collection agency to enable collection of the account in the agency's name as assignee for the creditor provided:**

**(a) The assignment is manifested by a written agreement, separate from and in addition to any document intended for the purpose of listing a debt with a collection agency. The document manifesting the assignment shall specifically state and include:**

**(i) the effective date of the assignment; and**

**(ii) the consideration for the assignment.**

**(b) The consideration for the assignment may be paid or given either before or after the effective date of the assignment. The consideration may be contingent upon the settlement or outcome of litigation and if the claim being assigned has been listed with the collection agency as an account for collection, the consideration for assignment may be the same as the fee for collection.**

**(c) All assignments shall be voluntary and properly executed and acknowledged by the corporate authority or individual transferring title to the collection agency before any action can be taken in the name of the collection agency.**

**(d) No assignment shall be required by any agreement to list a debt with a collection agency as an account for collection.**

**(e) No litigation shall commence in the name of the licensee as plaintiff**

4

**unless: (i) there is an assignment of the account that satisfies the requirements of this Section and (ii) the licensee is represented by a licensed attorney at law. . . .**

10.    Furthermore, the assignment must be attached to the complaint. <u>Candice Co. v. Ricketts</u>, 281 Ill.App.3d 359, 362, 666 N.E.2d 722 (1st Dist. 1996).

11.    Finally, the assignee is required "in his or her pleading on oath allege that he or she is the actual bona fide owner thereof, and set forth how and when he or she acquired title. . . . "   735 ILCS 5/2-403(a).

12.    Defendant Unifund CCR Partners, a debt buyer regulated by the ICAA since January 1, 2008, systematically files collection lawsuits without compliance with ICAA §8b and, therefore, without valid claims.

13.    In this action, plaintiff complains that such practice violates both the Fair Debt Collection Practices Act, 15 U.S.C. §§1692e and 1692f, and ICAA §9.

### VENUE AND JURISDICTION

14.    This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28 U.S.C. §1331, 28 U.S.C. §1337, and 28 U.S.C. §1367.  The Court also has jurisdiction under 28 U.S.C. §1332(d), in that the parties are of diverse citizenship and the classwide recovery exceeds $5 million.

15.    Venue and personal jurisdiction in this District are proper because:

a.    Defendant's collection communications and activities impacted plaintiff  within this District;

b.    Defendant does business within this District.

### PARTIES

16.    Plaintiff Chad Idol  is an individual who resides in the Northern District of Illinois.    He is a domiciliary and citizen of Illinois.

17.    Defendant Unifund CCR Partners ("Unifund") is a general partnership which  is engaged in the business of purchasing charged-off debts allegedly owed by consumers

5

and attempting to collect them from the consumers.

18.     Unifund CCR Partners operates from an address of 10625 Techwoods Circle, Cincinnati, Ohio 45242.

19.     Unifund CCR Partners pays an average of less than ten cents on the dollar for the debts it purchases.

20.     More than 50% of the debts purchased by Unifund CCR Partners are credit card debts.

21.     Unifund CCR Partners states on its Web site, www.unifund.com, that "Unifund is one of the country's leading purchasers, sellers and managers of under-performing and distressed consumer receivables. Unifund offers sellers an opportunity to unlock the value of their dormant delinquent receivables . . . ." The same Web site also states, "In 1989, Unifund began buying distressed loan portfolios on a national scale from small banks and retailers. One year later, the company began purchasing portfolios from large financial institutions. Today, the company is one of the largest buyers and resellers of consumer debt in the nation."

22.     According to an interview of Unifund's principal executive officer in the Cincinnati Enquirer, Nov. 23, 2004, Unifund pays four to ten cents on the dollar for debts and recovers an average of 20 cents on the dollar.

23.     Unifund CCR Partners owns approximately $12 billion in charged-off debts, according to an interview of its principal executive officer in the Cincinnati Business Courier of September 3, 2007. Dan Monk, "Consumer debt? He loves it; Unifund thrives by taking on others' unpaid bills, to tune of $12 billion."

24.     Because the purported obligations were originally owed to other entities and were charged off prior to purchase,  Unifund CCR Partners is a "debt collector" as defined in the FDCPA, 15 U.S.C. § 1692a(6).

25.     Defendant Unifund CCR Partners is also a "collection agency" as defined in the ICAA, and in fact holds a license under the ICAA.

6

26.     On information and belief, defendant Unifund CCR Partners has two partners, Credit Card Receivables Fund, Inc. and ZB Limited Partnership.

27.     Defendant Credit Card Receivables Fund, Inc. is a corporation chartered under the laws of the State of Ohio and a general partner of Unifund.  It operates from an address of 10635 Techwoods Circle, Cincinnati, Ohio 45242. As general partner, all acts of Unifund are chargeable to it.

28.     Defendant ZB Limited Partnership is a limited partnership entity chartered under the laws of the State of Delaware and is a general partner of Unifund.  Its address for service of process is The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, DE  19808.  As general partner, all acts of Unifund are chargeable to it.

29.     Unifund CCR Partners regularly files lawsuits to attempt to collect the debts.

30.     Unifund CCR Partners has filed more than 1,000 lawsuits in the Circuit Court of Cook County alone between January 1, 2008 and April 26, 2008.   Other lawsuits were filed in other Illinois counties.

### FACTS RELATING TO PLAINTIFF

31.     On or about Feb. 7, 2008, Unifund CCR Partners filed suit against plaintiff Chad Idol in the Circuit Court of Cook County to collect a purported debt incurred for personal, family or household purposes.   Unifund CCR Partners claimed to have purchased the debt.

32.     The complaint did not attach any sort of assignment.

33.     A copy of the complaint and all attachments is in Exhibit A.

34.     On information and belief, defendant did not have an assignment that complied with §8b of the Collection Agency Act.

35.     Defendant therefore did not have any sort of valid claim and knew or should have known that it did not have a valid claim.

7

36.    Prior to Feb. 7, 2008, the provisions of ICAA §8b had been specifically called to the attention of Unifund CCR Partners, in <u>Unifund CCR Partners v. Cox</u>, 2008 AR 000022 (DuPage Co. Cir. Ct.).

37.    Unifund CCR Partners deliberately chose to not comply with ICAA §8b.

38.    The first page of <u>Exhibit A</u> represents that "Plaintiff acquired by purchase assignment from the original credit issuer or its successor the account of Defendant(s), and is now the bona fide holder of this claim."  Because of the absence of an assignment that complied with the ICAA, this statement was false.

39.    The second page of <u>Exhibit A</u> represents that "Said agreement and account was sold or transferred or assigned and set unto, UNIFUND CCR PARTNERS, with full power and authority to do and perform all acts necessary for the collection, settlement, adjustment, compromise or satisfaction of the said claim. . . . Affiant acknowledges [sic] that in making this Affidavit UNIFUND CCR PARTNERS (current holder or assignee) has complete authority to settle, adjust, compromise and satisfy the same."  Because of the absence of an assignment that complied with the ICAA, this statement was false.

40.    These two pages of <u>Exhibit A</u> are standard form documents filed by Unifund in all or most collection actions filed in Illinois during 2008.

## FACTS  – GENERAL

41.    Defendant Unifund CCR Partners regularly files lawsuits on debts it claims to have purchased without having an assignment that complies with §8b of the Collection Agency Act, and therefore, without a valid claim.

42.    Defendant knows or should know it has no valid claim, but files suit anyway because consumers are unlikely to realize the fact.

43.    Defendant Unifund CCR Partners regularly represents that it is authorized to file suit on such debts, notwithstanding the absence of any assignment.

44.    On information and belief, based on a computer search of court records,

defendant has filed over 1,000 such lawsuits.

## CLASS ALLEGATIONS

45.     Plaintiff brings this action on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).  The class consists of (a) all individuals (b) against whom defendant Unifund CCR Partners filed a collection lawsuit (c) in Illinois (d) subsequent to January 1, 2008, (e) without attaching to the complaint an assignment that complied with §8b of the ICAA.

46.     The class is so numerous that joinder of all members is not practicable.

47.     On information and belief, there are at least 40 all individuals against whom defendant Unifund CCR Partners filed a collection lawsuit in Illinois subsequent to January 1, 2008, without attaching to the complaint an assignment that complied with §8b of the ICAA.

48.     There are questions of law and fact common to the class members, which common  questions predominate over any questions relating to individual class members.  The predominant common questions are:

a.     Whether defendant engages in a practice of filing lawsuits without attaching  to the complaint an assignment that complied with §8b of the ICAA.

b.     Whether such lawsuits are therefore subject to a defense of which defendant knows or should know about.

c.     Whether defendant affirmatively misrepresents its entitlement to file suit and ownership of the alleged debts.

d.     Whether such practice is an unfair or deceptive.

e.     Whether defendant violates the ICAA.

49.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

50.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

51.     A class action is superior for the fair and efficient adjudication of this matter, in that:

          a.     Individual actions are not economically feasible.

          b.     Members of the class are likely to be unaware of their rights;

          c.     Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

## COUNT I – FAIR DEBT COLLECTION PRACTICES ACT

52.     Plaintiff incorporates paragraphs 1-51.

53.     The filing and prosecution of collection lawsuits notwithstanding a known defense, in the hope that the consumer will not raise the defense, is both a deceptive collection practice, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(5), and 1692e(10), and an unfair collection practice, in violation of 15 U.S.C. §1692f.

54.     Since Kimber v. Federal Financial Corp., 668 F. Supp. 1480, 1488 (M.D.Ala. 1987), "bringing a lawsuit to which there appears to exist a complete defense" in the hope that the consumer will not realize it exists and will default or pay  has been a violation of the FDCPA.

55.     In addition, the statements in Exhibit A that "Plaintiff acquired by purchase assignment from the original credit issuer or its successor the account of Defendant(s), and is now the bona fide holder of this claim," that "Said agreement and account was sold or transferred or assigned and set unto, UNIFUND CCR PARTNERS, with full power and authority to do and perform all acts necessary for the collection, settlement, adjustment, compromise or satisfaction of the said claim" and that "Affiant acknowledges [sic] that in making this Affidavit UNIFUND CCR PARTNERS (current holder or assignee) has complete authority to settle, adjust, compromise and satisfy the same" are false.

56.     Section 1692e provides:

**§ 1692e.          False or misleading representations [Section 807 of P.L.]**

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(2)     The false representation of--

(A)     the character, amount, or legal status of any debt; . . .

(5)     The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

(10)     The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

57.     Section 1692f provides:

§ 1692f.     Unfair practices [Section 808 of P.L.]

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendants for:

(1)     Statutory damages;

(2)     Actual damages;

(3)     Attorney's fees, litigation expenses and costs of suit;

(4)     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS COLLECTION AGENCY ACT

58.     Plaintiff incorporates paragraphs 1-51.

59.     Defendant Unifund CCR Partners is a "collection agency" as defined in the ICAA.

60.     Section 425/3(d), as amended effective Jan. 1, 2008, brings debt buyers within its purview by providing that "A person, association, partnership, corporation, or other legal entity acts as a collection agency when he or it . . . Buys accounts, bills or other indebtedness and engages in collecting the same." Previously coverage was limited to a person

11

who "Buys accounts, bills or other indebtedness with recourse and engages in collecting the same".  By deleting "with recourse," the legislature intended to classify as a "collection agency" persons such as the defendant who buy charged-off debts for their own account.

61.    Defendant Unifund CCR Partners violated 225 ILCS 425/8b by filing suit without an assignment in the form specified therein.

62.    Defendant violated the following provisions of 225 ILCS 425/9:

**. . .(20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist.  . . .**

63.    A private right of action exists for violation of the ICAA.  Sherman v. Field Clinic, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1ˢᵗ Dist. 1979).

64.    Plaintiff and the members of the class were damaged as a result.

WHEREFORE, plaintiff requests that the Court grant the following relief in favor of plaintiff and the class and against defendants:

a.    Compensatory, punitive and nominal damages;

b.    Costs.

c.    Such other and further relief as is appropriate.

## COUNT III  – ILLINOIS CONSUMER FRAUD ACT

65.    Plaintiff incorporates paragraphs 1-51.

66.    Defendant Unifund CCR Partners' conduct as set forth above constitutes both unfair and  deceptive acts and practices, in violation of  §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

67.    Defendant Unifund CCR Partners' engaged in such conduct in the course of trade and commerce.

68.    Defendant Unifund CCR Partners' engaged in such conduct for the purpose of obtaining money from plaintiff and others.

69.    Plaintiff and the members of the class were damaged as a result.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiff and the class and against defendants for:

      a.      Actual damages;

      b.      Punitive damages;

      c.      An injunction against further violations;

      d.      Attorney's fees, litigation expenses and costs of suit;

      e.      Such other or further relief as the Court deems proper.

                                            Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
     & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

13

## JURY DEMAND

Plaintiff demands trial by jury.

_____
Daniel A. Edelman

T:\21348\Pleading\Complaint_Pleading.wpd

14

## **NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

15

**EXHIBIT A**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

| | | |
|---|---|---|
| UNIFUND CCR PARTNERS ASSIGNEE OF PALISADES ACQUISITION XVI, LLC<br>Plaintiff, | ) Case No.<br>) Contract | 08M1   110371 |
| vs. | ) Amount Claimed $947.84 | |
| | ) Plus attorney fees, interest and costs | |
| CHAD IDOL | ) | |
| | ) Return Date:   MAR 0 6 2008 CERTIFIED MAIL | |
| Defendant(s) | ) | |

## VERIFIED COMPLAINT AT LAW

NOW COMES the Plaintiff, UNIFUND CCR PARTNERS ASSIGNEE OF PALISADES ACQUISITION XVI, LLC, by and through its attorneys, ADLER & ASSOCIATES, LTD., and for its complaint against the Defendant(s), CHAD IDOL  , (hereinafter referred to as "Defendant(s)") alleges and states as follows:

1. Plaintiff acquired by purchase assignment from the original credit issuer or its successor the account of Defendant(s), and is now the bona fide holder of this claim.

2. Upon information and belief from the representations of the assignor, at the specific instance and request of the Defendant(s) directly or through a retail merchant , Providian National Bank  issued to Defendant(s) a certain credit card/revolving charge (open and consumer credit) account.

3. Upon information and belief Defendant(s) made various charges to said account since the date of issuance and, after accounting for payments made, there remains an unpaid and past due balance in the sum of $942.42, as set forth in the attached affidavit.

4. Demand for payment has been made upon the Defendant(s) but Defendant(s) has/have failed or refused to pay said remaining balance.

5. Plaintiff claims reasonable attorneys' fees in the sum of $350.00, as provided for in the cardmember agreement, if attached, together with accruing interest, pursuant to the same agreement, at the rate of 5% from November 15, 2007 until the date of judgment. That Plaintiff claims accrued interest of $5.42 to December 27, 2007.

WHEREFORE, Plaintiff, UNIFUND CCR PARTNERS ASSIGNEE OF PALISADES ACQUISITION XVI, LLC, prays judgment be entered in its favor and against the Defendant(s), CHAD IDOL  , in the amount of $947.84, plus applicable attorney fees, interest and costs.

ADLER & ASSOCIATES, LTD.

BY:_____
               For the Firm

ADLER & ASSOCIATES, LTD., #00512
ATTORNEYS FOR PLAINTIFF
25 E. WASHINGTON, #500
CHICAGO, IL 60602
312 726-1814
H08159

UNIFUND CCR PARTNERS

        Plaintiff,

vs.

CHAD IDOL

        Defendant(s)

## AFFIDAVIT OF SALE/ASSIGNMENT
## AND OF ACCOUNT BALANCE DUE

I, ___Joseph Lutz___, an employee of UNIFUND CCR PARTNERS, being duly sworn on oath say:

I am acting in the capacity of Record Specialist & Account Manager for my employer UNIFUND CCR PARTNERS, a partnership organized under the laws of the state of New York, and doing business under the laws of the state of Illinois. I am familiar with the manner and method of which UNIFUND CCR PARTNERS maintains the books and records of its accounts and its affiliates' accounts.

In the normal course of business, UNIFUND CCR PARTNERS maintains computerized account records for accountholders who have delinquent credit accounts purchased by or assigned to UNIFUND CCR PARTNERS. UNIFUND CCR PARTNERS maintains such records in the ordinary and routine course of business and is charged with the duty to accurately record any business act, condition or event into the computer record maintained for the accounts, with the entries made at or near the time of any such occurrence. I have reviewed the relevant computer record as it relates to the above accountholder's credit account, and I make this declaration based upon information from that review, together with a review of any and all records provided by the assignor or prior holder of the account, if any, and if called as a witness, I could testify to the following based on that review.

1.) That the claim and cause of action against Defendant(s), bearing account number 4031171500552991, is due and owing the total balance of $942.42, as more fully stated in the Complaint (and attached exhibits) filed against Defendant(s). The debt continues to accrue interest at the legally permitted rate of 5%, from November 15, 2007 to the date of judgment; after which interest shall accrue at 9% per annum together with attorney fees where applicable and provided in the contractual agreement, if attached.

2.) Said agreement and account was sold or transferred or assigned and set unto, UNIFUND CCR PARTNERS, with full power and authority to do and perform all acts necessary for the collection, settlement, adjustment, compromise or satisfaction of the said claim. Further, Affiant states that to the best of Affiant's knowledge, information and belief, there were no uncredited payments, just counterclaims, or offsets against the said debt when sold. Further, the Affiant acknowledges that in making this Affidavit UNIFUND CCR PARTNERS *(current holder or assignee)* has complete authority to settle, adjust, compromise and satisfy the same.

3.) That the Defendant, if an individual, is not believed to be an active member of any branch of the armed forces of the United States of America, which belief is based upon Plaintiff's personal knowledge, communication to or from the Defendant and review of credit application and/or credit reports and documents.

Under oath, I am authorized to make this affidavit for UNIFUND CCR PARTNERS, and am informed and believe the above statements are true and correct.

This affidavit executed this 27th day of November, 2007.

                                 Signature

                                 Name printed: Joseph Lutz

The foregoing affidavit sworn to and subscribed before me this 27th day of November, 2007.

Notary Public

                                 H08159

**JENNIFER L. BUSH**
Notary Public, State of Ohio
My Commission Expires
October 14, 2009





Providian National Bank WebCard® VISA
Account Agreement

Please review this document and keep it with your other important papers. This Account Agreement contains the terms which govern your Providian National Bank VISA or MasterCard Account (the "Account"). The Account allows you to make purchases by using your VISA or MasterCard card (the "Card") wherever it is honored and to get cash advances from us or any other participating financial institution and from Automated Teller Machines. Convenience checks may also be provided to you as an additional way to use the Account. In this Agreement, "you" and "your" mean each person for whom we have opened a credit card Account. "We", "our", "ours", and "us" mean Providian National Bank or its assignees, as listed on your billing statement. The Account may be used only for personal, family, household, and charitable purposes, and not for any business or commercial purpose. Any use of this Account shall constitute acceptance of the terms of this Agreement. You and we agree as follows:

Payments. You will receive a monthly statement showing your outstanding balance. Payment on this Account is required in U.S. dollars (checks must be payable at a U.S. office of the bank the check is drawn on) for at least the payment due as shown on your statement by the payment due date in accordance with payment instructions on your monthly statement. The back of your statements shows the rules we follow when we post payments. Convenience checks and other checks we issue to you may not be used to make payments on your Account or to make payments on any other account you have with us or our affiliates. The payment due will be 2% of the new balance shown on your statement plus the amount of any past due payment, and may include the amount by which the new balance exceeds your credit line. However, the payment due will not be less than $15 (unless your new balance is less than $15, in which case the payment due will be the amount of the new balance). If your Account is past due or above the credit line, we may require a higher minimum payment, but we will notify you before doing so. If your payment is more than the payment due, it will be treated as a single payment and none of it will be applied to future payments due. We may accept late or partial payments, or payments marked "paid in full" or marked with other restrictions, without losing our right to collect all amounts owing under this Agreement.

Finance Charges. Except as described in the Grace Period for Purchase Balance section of this Agreement, finance charges begin to accrue on a debit when it is included in one of your daily balances and continue until that balance is reduced by a payment or credit. Your Account has the following balances: The Purchase Balance, which consists of your existing Purchase Balance and new purchases you make with your Card and fees for certain optional services; one or more Custom Cash Advance Balances, which consists of balances that you transfer to your Account using balance transfer checks and balances that we transfer for you; and the Cash Advance Balance which consists of all other cash advances and cash advance transaction fees. Any payment amount we receive that exceeds the finance charges and fees then due will ordinarily be applied first to the Balance with the lowest Annual Percentage Rate (APR), until that Balance is zero and then to the Balance with the next lowest APR, until that Balance is zero, and then to any remaining Balance. We reserve the right to apply payments differently without further notice.

The Purchase, Custom Cash Advance, and Cash Advance Balances are reduced by payments as of the date received, and by credits as of the date posted. Purchases are included in your Purchase Balance as of the date made. Custom cash advances are included in your Custom Cash Advance Balance as follows: funds electronically transmitted to other lenders to transfer balances, as of the date transmitted; checks to transfer balances, as of the date presented to us. Other cash advances are included in your Cash Advance Balance as follows: cash advances from other financial institutions and through Automated Tellers, as of the date made; cash advance checks made payable to you that are identified as cashier's checks and mailed to you at your request, as of seven days after the date we print on the check; all other checks, as of the date presented to us. Other debits are included in your Purchase, Custom Cash Advance, or Cash Advance Balance as of the date posted. Finance charges are added to your Purchase, Custom Cash Advance, and Cash Advance Balances each day and are then posted on the last day of the billing cycle. There is no grace period for custom cash advances or other cash advances.

To figure the daily finance charge for each type of Balance, we start with your previous day's Balance, add all debits and subtract all credits for the current day and multiply the net amount by the applicable daily periodic rate (see following paragraphs). The finance charge for each type of Balance is then added to and included in that day's Balance. We treat a credit balance for any day as zero. We determine the total finance charges on balances for the billing cycle by adding together the finance charges for each type of Balance for each day within the billing cycle. In calculating finance charges, an adjustment will be made for any transaction or payment that would have affected the finance charge calculation in a prior billing cycle had it been posted in that cycle. The applicable daily periodic rate for such a transaction will be the rate in effect for the current billing cycle rather than the rate in effect on the date of the transaction.

Your statement includes an average daily balance for each type of Balance. You can multiply each average daily balance that is not zero by the number of days in the billing cycle and the periodic rate to obtain subtotals, and then add the subtotals together to determine your total finance charges on balances for the billing cycle. If a cash advance transaction fee is charged, that amount is also a finance charge.

The term "Prime Rate" as used in the Agreement means the highest prime rate published in the Wall Street Journal on the first business day of the previous calendar month. Any increase or decrease in the Annual Percentage Rate will take effect on the first day of your billing cycle and may result in a slight increase or decrease in the amount of your minimum payment.

The ANNUAL PERCENTAGE RATE (APR) for purchases may vary and will be adjusted each billing cycle to 10.24% above Prime Rate, but will in no event be less than 17.99%. Using this formula, the APR for purchases in the October 2000 billing cycle is 19.74%, corresponding to a daily periodic rate of 0.05408%.

The ANNUAL PERCENTAGE RATE for cash advances is 19.99% corresponding to a daily periodic rate of 0.05477%

If we receive your Account payment late 2 or more times in any 6-month period, on each such occurrence we may increase the APR for purchases up to a maximum of 23.30% (corresponding to a daily periodic rate of 0.06384%) and increase the APR for cash advances and custom cash advances up to a maximum of 23.30% (corresponding to a daily periodic rate of 0.06384%). If after you receive the higher rates your payments are received on time and you meet all other terms of this Agreement for 3 consecutive months, you may contact our Customer Service department and, at your request, we will review your Account for a possible APR reduction.

Grace Period for Purchase Balance. New purchases posted to your Account in billing cycles with no previous balance, or when the previous balance was fully paid during the cycle, do not begin to incur a finance charge until the start of the next billing cycle. You will pay no finance charge on such new purchases if you pay the total new balance in full by the payment due date shown on your statement. New purchases posted in any other billing cycle incur a finance charge and there is no period in which such purchases may be repaid without incurring a finance charge.

Rebate. On the last day of each monthly statement period we will credit your Account with 1% of your net purchase transactions posted during the statement period. "Net Purchase Transactions" means Card purchases, less purchase adjustments and purchase credits posted during the period.

Fees. We may charge your Account $0 for: each Card you ask us to replace; each returned payment; each check you write on your Account that we return unpaid; each stop payment order or renewal of such an order; each billing cycle within which your Account is delinquent (late charge); and each billing cycle within which your balance exceeds your credit line (overlimit fee), even if your Account is closed. If you request copies of billing statements that were first sent to you more than three months earlier, we may charge a handling fee of $2 for each such copy. If you request that we make a one-time automatic

...ayment from your personal checking account, we may charge your credit card account a fee of $4.95 for each request. This fee is a **FINANCE CHARGE**, and it will apply regardless of whether funds are available in your personal checking account to make the payment.

We may charge a transaction fee of 3% (minimum $5), which is a one-time **FINANCE CHARGE**, on the amount of each cash advance, including cash from financial institutions, and ATMs, wire transfers, money orders, lottery tickets, casino gaming chips, and similar transactions.

**Default.** You will be in default: if any information you provided us proves to be incomplete or untrue; if you do not comply with any part of this Agreement; upon your death, bankruptcy, or insolvency; if you do not pay other debts when due, if a bankruptcy petition is filed by or against you; or if we believe in good faith that you may not pay or perform your obligations under this Agreement. If you are in default we may, without further demand or notice, cancel your credit privileges, declare your Account balance immediately due and payable, and use any remedy we may have. In the event of your default, the outstanding balance on your Account shall continue to accrue interest at the APR(s) disclosed in the Finance Charges section of this Agreement, even if we have filed suit to collect the amount you owe.

**Credit Line.** Your credit line is specified from time to time in a separate notice. Your monthly statements show your credit line and the amount of your available credit. We may increase or decrease your credit line based on information we obtained from you or your credit records. Your available credit is normally the difference between your credit line and your Account balance (including transactions made or authorized but not yet posted). If you send us a large payment check, we may limit your available credit while we confirm that the check will clear. For certain transactions, available credit may be less. You will not use your Account for, and we may refuse to honor, any transaction which would cause you to exceed your available credit.

**Promise to Pay.** You promise to pay us when due all amounts borrowed when you or someone else use your Account (even if the amount charged exceeds your permission), all other transactions and charges to your Account, and collection costs we incur including, but not limited to, reasonable attorney's fees and court costs. (If you win the suit, we will pay your reasonable attorney's fees and court costs.)

**Changes.** After we provide you any notice required by law, we may change any part of this Agreement and add or remove requirements. If a change is made to the Finance Charges section of this Agreement, the new finance charge calculation will apply to your entire Account balance from the effective date of the change. Changes will apply to balances that include items posted to your Account before the date of the change, and will apply whether or not you continue to use the Account.

**Foreign Exchange/Currency Conversion.** If you use your Card for transactions in a currency other than U.S. dollars, the transactions will be converted to U.S. dollars, generally using either a (i) government-mandated rate or (ii) wholesale market rate in effect the day before the transaction is processed, increased by three percent (3%). If a credit is subsequently given for a transaction, it will be decreased by the same percentage. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card. You agree to accept the converted amount in U.S. dollars.

**The Card; Cancellation.** You may cancel your credit privileges at any time by notifying us in writing and destroying the Card(s). Upon the Card expiration at the end of the month shown on it, we reserve the right not to renew the Card. We may cancel the Card and your credit privileges at any time after 30 days notice to you, or without notice if permitted by law. If your Card is cancelled or not renewed, finance charges and other fees will continue to be assessed, payments will continue to be due, and all other applicable provisions of this Agreement will remain in effect. If you terminate your credit privileges, or if we cancel or do not renew the Card, you may no longer write checks on your Account, and you should destroy any unused checks we have issued to you.

**Personal Information; Documents.** You will provide us at least 10 days notice if you change your name, home or mailing address, telephone numbers, employment or income. Upon our request, you will provide us additional financial information. We reserve the right to obtain information from others, including credit reporting agencies, and to provide your address and information about your Account to others. We may also share information with our affiliates. However, you may write to us at any time instructing us not to share credit information with our affiliates. If you do not fulfill your obligations under this Agreement, a negative credit report that may reflect on your credit may be submitted to the credit reporting agencies.

**Customer Service; Unauthorized Use, Loss, or Theft of Checks or the Card.** Each Card must be signed on receipt. You are responsible for safeguarding the Card, your Personal Identification Number ("PIN", which provides access to Automated Teller Machines) and any checks issued to you from theft, and keeping your PIN separate from your Card. If you discover or suspect that your Card, PIN, or any unused checks are lost or stolen, or that there may be an unauthorized transaction on your Account, you will promptly notify us by calling 1-800-933-7221. So we can immediately act to limit losses and liability, you will phone us even though you may also notify us in writing. You will not be liable for unauthorized use occurring before you notify us of a loss or theft. If you report or we suspect unauthorized use of your Account, we may suspend your credit privileges until we resolve the problem to our satisfaction or issue you a new Card. If your Card is lost or stolen, you will promptly destroy all checks in your possession. To improve customer service and security, you agree that your calls may be monitored or recorded.

**Merchant Relations.** We will not be liable if any person or Automated Teller Machine refuses to honor the Card or accept your checks, or fails to return the card to you. We have no responsibility for goods and services purchased with the Card or checks except as required by law. (See Special Rule below.) Certain benefits that are available with the Account are provided by third-party vendors. We are not responsible for the quality, availability, or results of any of the services you choose to use.

**Stop Payment Orders.** If you wish to stop payment on a check, you may send us a stop payment order by writing to us at our address for customer service listed on your statement. You can make a stop payment order orally by calling the number listed on your statement. When you make a stop payment order you must provide your Account number and specific information about the check: the exact amount, the date on the check, the name of the party to whom it was payable, the name of the person who signed it, and the check number. You will be asked to confirm an oral stop payment order in writing. We may disregard your oral order if we do not receive a signed written confirmation within two weeks after the oral order, or if we have not received an adequate description of the item so that payment can be stopped. The order will not be effective if the check was paid by us before we had a reasonable opportunity to act on the order. We may, without liability, disregard a written stop payment order six months after receipt unless it is renewed in writing.

**Standard of Care.** Because this Account involves both credit card and check transactions which are processed through separate national systems before the transactions are consolidated by us, and because not every check and Card slip will be sent to us, transactions in your Account will be processed mechanically without our necessarily reviewing every item. Our processing system will call our attention to certain items which we will examine. We will examine all transactions when you report that your Card or checks have been lost or stolen. We do not intend ordinarily to examine all items, and we will not be negligent if we do not do so. This rule establishes the standard of ordinary care which we in good faith will exercise in administering your Account. Because of our limited review, and because neither your cancelled checks nor Card transaction slips will be returned to you with the monthly statement, you should be careful to enter all checks in your check register or otherwise keep a record of them. You should also save your credit card cash advance and purchase slips. You agree to check your monthly statements against your record and to notify us immediately of any unauthorized transactions or errors.

**Waiver of Certain Rights.** We may delay or waive enforcement of any provision of this Agreement without losing our right to enforce it or any other provision later. You waive: the right to presentment, demand, protest, or notice of dishonor; any applicable statute of limitations; and any right you may have to require us to proceed against anyone before we file suit against you.

**Applicable Law; Severability; Assignment.** No matter where you live, this Agreement and your Account are governed by federal law and by New Hampshire law. This Agreement is a final expression of the agreement between you and us and may not be contradicted by evidence of any alleged oral agreement. If any provision of this Agreement is held to be invalid or unenforceable, you and we will consider that provision modified to conform to applicable law, and the rest of the provisions in the Agreement will still be enforceable. At any time after we determine in good faith that any proposed or enacted legislation, regulatory action, or judicial decision has rendered or may render any material provisions of this Agreement invalid or unenforceable, or impose any increased tax, reporting requirement, or other burden in connection with any such provision or its enforcement, we may, after at least 30 days notice to you, or without notice if permitted by law, cancel the Card and your Credit privileges. We may transfer or assign our right to all or some of your payments. If

 **PROVIDIAN** *Financial*

state law requires that you receive notice of such an event to protect the purchaser or assignee, we may give you such notice by filing a financing statement with the state's Secretary of State.

**Notices.** Other notices to you shall be effective when deposited in the mail addressed to you at the address shown on our records, unless a longer notice period is specified in this Agreement or by law, which period shall start upon mailing. Notice to us shall be mailed to our address for customer service on your statement (or other addresses we may specify) and shall be effective when we receive it.

**YOUR BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE.** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill.** If you think your bill is wrong or if you need more information about any transaction on your bill, write us on a separate sheet, at the address listed in the Billing Rights Summary on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information: – Your name and Account number. – The dollar amount of the suspected error. – Describe the error and explain, if you can why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice.** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct. After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charge related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up the missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you question your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is. If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases.** If you have a problem with the quality of the property or services that you purchased with our credit card and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. There are two limitations on this right: (a) you must have made the purchase in your home state, or if not within your home state, within 100 miles of your current mailing address; and (b) the purchase price must have been more than $50. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.